## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

MARCO A. MICHALSKI,
      *Plaintiff*,

            v.                                          No. 3:20-cv-1359 (VAB)

COLLEEN GALLAGHER et al.,
      *Defendants.*

### INITIAL REVIEW ORDER ON AMENDED COMPLAINT

Marco Michalski ("Plaintiff"), a sentenced *pro se* inmate in the custody of the

Department of Correction ("DOC") at Osborn Correctional Institution, filed a civil rights

Complaint under 42 U.S.C. § 1983. Compl., ECF No. 1 (Sept. 10, 2020). Mr. Michalski alleged

violations of the Eighth Amendment to the United States Constitution against Osborn Director of

Health Services Colleen Gallagher, Osborn Health Services Administrator ("HSA") Richard

Furey, HSR Appeals Coordinators John Doe 1, John Doe 2, Osborn American with Disabilities

("ADA") Coordinator Devonia Long, University of Connecticut Health Occupational Therapist

Megan Bartos, Cheshire Correctional Institution Dr. Ricardo Ruiz, and former DOC

Commissioner Scott Semple, both in their individual and official capacities. *Id.*

On initial review, the Court permitted Mr. Michalski's Eighth Amendment claims based

on deliberate indifference to his need for a medical mattress to proceed against Director Colleen

Gallagher and ADA Coordinator Devonia Long in their individual capacities; and his Eighth

Amendment claims based on deliberate indifference to his need for padding to proceed against

Dr. Ruiz and Director Gallagher in their individual capacities. Initial Review Order at 21, ECF

No. 19 (May 14, 2021). The Court dismissed without prejudice his Eighth Amendment claims

against Occupational Therapist Bartos based on her failure to answer his questions about testing,

1

padding, and medical mattresses, *id.* at 13–14; his Eighth Amendment claims against Director

Gallagaher, HSA Furey, ADA Coordinators John Does 1 and 2, and Dr. Ruiz arising from their

alleged deliberate indifference to his need for genetic testing, *id.* at 15–17; and his supervisory

liablity claims against Commissioner Semple, *id.* at 17–19.

Mr. Michaelski has filed an Amended Complaint against Defendants Gallagher, Furey,

Ruiz and Long. Am. Compl., ECF No. 25 (June 2, 2021). Upon review, the Court will permit

Mr. Michalski's Eighth Amendment claims to proceed against the Defendants.

## I.   FACTUAL BACKGROUND[1]

Mr. Michalski allegedly has a history of painful monnoueuropathies, muscle atrophy.

and sensory loss of his hand due to severe bilateral Carpel Tunnel Syndrome ("CTS"),

cubital tunnel syndrome in his elbows, and chronic neuritis in left elbow. Am. Compl. ¶¶ 7–

10. Mr. Michalski allegedly had surgery for his CTS and for nerve decompression in June 2016,

which did not relieve his symptoms of pain and numbness. *Id.* ¶¶ 12–13. In 2017, Dr.

Imperiolli, a neurologist at UConn Health, allegedly supected that Mr. Michalski had a

genetic disease known as Herditary Neuropathy with Liability to Pressure Palsies

("HNPP"), and allegedly explained that a positive test for HNPP would not change Mr.

Michalski's management (except for pain management). *Id.* ¶ 15.

Thereafter, Dr. Ruiz, who was Mr. Michalski's facility doctor at Cheshire

Correctional Institution ("Cheshire"), allegedly failed to submit a request for the genetic

testing for HNPP. *Id.* ¶ 16. Allegedly, the only treatment at this time for HNPP was to avoid

compressing the nerves and the medication (Neurontin). *Id.* ¶ 17. On Dr. Imperiolli's

---

[1] All factual allegations are drawn from the Amended Complaint. Am. Compl., ECF No. 25 (June 2, 2021).

recommendation, Mr. Michalski allegedly requested from Dr. Ruiz a medical mattress and elbow padding to avoid further nerve compression, but this request was denied. *Id.* ¶ 18.

In October 2017, Mr. Michalski allegedly had Magenetic Resonance Imaging ("MRI") that revealed bilateral CTS and left ulnar mononeuropathy at the elbow and persistent symptoms of the left ulnar nerve compression. *Id.* ¶¶ 19–20. Dr. Ruiz, however, despite knowing the possibility of an HNPP diagnosis and Mr. Michalski's need to avoid nerve compression, allegedly failed to submit a Utilization Review Committee ("URC") request for genetic testing for HNPP. *Id*. ¶ 21. Dr. Ruiz also allegedly failed to provide Mr. Michalski with any elbow padding or extra bedding. *Id.* Dr. Imperiolli had noted that a HNPP diagnosis would not change the mangement of Mr. Michalski's condition. *Id.* ¶ 22. The management of Mr. Michalski's conditions, however, allegedly was inadequate, as it consisted only of Neurontin but no padding. *Id.*

On February 7, 2018, Mr. Michalski allegedly met with Dr. Imperiolli for an Electromyography ("EMG") on his upper and lower extremities on the left side, which allegedly showed evidence of left ulnar mononeuropathy at the elbow, partial conduction block at the forearm, and left mononeuropathy at the wrist. *Id.* ¶ 25. Dr. Imperiolli allegedly noted that HNPP remained a diagnostic consideration. *Id.* ¶ 26.

On September 3, 2018, Mr. Michalski allegedly filed an American with Disabilities Act ("ADA") form for a medical mattress. *Id.* ¶ 27. However, ADA Coordinator Devonia Long, however, allegedly denied the request for a medical mattress without any evaluation with medical professionals as required under Administrative Directive 10.19. *Id.* ¶¶ 28–30.

On October 5, 2018, Mr. Michalski allegedly appealed this denial but allegedly did not receive a response. *Id.* ¶ 31.

On November 29, 2018, Mr. Michalski allegedly filed a grievance regarding the failure to provide him with a response to his ADA appeal. *Id.* ¶ 32.

In March 2018, prison officials allegedly transferred Mr. Michalski to Osborn Correctional Institution ("Osborn"), where he was placed under the care of Dr. Johnny Wright. *Id.* ¶ 36.

On September 17, 2018, Mr. Michalski allegedly met with Dr. Imperiolli for a follow-up EMG, which revealed that his condition was getting worse. *Id.* ¶ 37. Dr. Imperiolli again allegedly noted that HNPP remained a diagnostic possibility. *Id.* ¶ 38. Nevertheless, Dr. Wright allegedly failed to submit a request to the URC for testing or to obtain elbow padding and additional bedding for Mr. Michalski. *Id.* ¶ 39.

HSA Furey allegedly responded to Mr. Michalski's Health Services Reviews ("HSRs") in a manner that indicated he had failed to the read the issues and request; Mr. Michalski allegedly had to write to him again to explain the situation. *Id.* ¶¶ 40–41.

On October 22, 2018, Mr. Michalski allegedly had an appointment with neurology staff at UConn Health and met with Dr. Donaldson, who allegedly noted Mr. Michalski's conditions and stated that he could well have HNPP; Dr. Donaldson's diagnosis was allegedly multiple mononeuropathies compatible with HNPP, which is usually associated with diabetes. *Id.* ¶¶ 42–43.

Thereafter, Mr. Michalski allegedly researched other nerve diseases and allegedly found that his syptoms of vertigo, spasticity in his legs, cold sweaty feet, twitching eyelids, and cognitive problems were consistent with Lyme Disease and Muliple Sclerosis. *Id.* ¶ 44. He allegedly wrote Dr. Wright an in depth letter about his research. *Id.*

On October 24, 2018, HSA Furey allegedly informed Mr. Michalski that he would try to get him the testing and that he would send an e-mail to HSR Director Colleen Gallagher. *Id.* ¶ 45. Director Gallagher, however, allegedly later told Mr. Michalski that he would not get the genetic testing because an HNPP diagnosis would not alter his management. *Id.* ¶ 46. Mr. Michalski allegedly responded that his managment was ineffective as his condition continued to worsen; that the testing could reveal if he had a treatable condition; and that he needed padding and bedding to avoid further nerve compression. *Id.* Director Gallagher allegedly denied these requests but sent him to occupational therapy. *Id.* ¶ 47.

On November 7, 2019, Mr. Michalski allegedly met with Dr. Wright, who said he would make requests for genetic testing and occupational therapy, but he did not make any request for genetic testing. *Id.* ¶¶ 48–50.

Mr. Michalski allegedly wrote a request to Deputy Warden Snyder stating he would pay for the genetic testing. *Id.* ¶ 51. This request was allegedly forwarded to HSA Furey, who allegedly never responded. *Id.*

On November 24, 2018, Mr. Michalski allegedly wrote Director Gallagher a detailed letter in response to her letter dated November 8, 2018. *Id.* ¶ 52.

On December 6, 2018,  Mr. Michalski allegedly tested negative for Lyme Disease. *Id.* ¶ 53.

On December 7, 2018, Mr Michalski allegedly again discussed his need for genetic testing, occupational therapy, a medical mattress, and padding with Director Gallagher. *Id.* ¶ 54. She allegedly told him that he would not receive the testing, matress, or elbow padding; she had allegedly decided to wait for an occupational therapy appointment prior to providing

him with an accommodation that may not have been best suited for his condition. *Id.* ¶¶ 54, 56.

On December 12, 2018, the URC allegedly approved Mr. Michalski's request for genetic testing. *Id.* ¶ 57. Upon Mr. Michalski's information and belief, Director Gallagher allegedly withdrew this approval after she discovered it. *Id.*

In a December 28, 2018 letter, Director Gallagher allegedly stated that Mr. Michalski's "desire to have genetic testing is not an accomodation and something that [his] neurologist and onsite provider may or may not feel is warranted" and that testing would not alter or prevent him from receiving accommodations recommended by providers. *Id.* ¶¶ 58, 61. Director Gallagher also allegedly suggested that the neurologist indicated that Mr. Michalski be tested for diabetes, although he had been tested numerous times. *Id.* ¶¶ 65–66. At this time, Director Gallagher allegedly knew that two neurologists wanted him to have this testing done and that his provider had ordered it to be performed. *Id.* ¶ 59.

Defendants Gallagher, Furey, Long and Ruiz all allegedly denied Mr. Michalski accommodations to prevent further damage because he lacked a diagnosis, although the testing had been recommended by specialists. *Id.* ¶¶ 62–65.

On December 24, 2018, Mr. Michalski allegedly filed an HSR request to be examined by a neurolgist and for genetic testing so that extent of his disease could be determiend. *Id.* ¶ 68.

On January 12, 2019, a nurse allegedly informed Mr. Michalski that the genetic testing had been withdrawn. *Id.* ¶ 69.

On January 17, 2019, Mr. Michalski allegedly wrote to HSA Furey inquiring about who withdrew the Utilization Review approval, and why; Mr. Michalski allegedly received a

response that the approval had been withdrawn by the Central Office. *Id.* ¶ 70. Later, HSA

Furey allegedly responded to another inmate request from Mr. Michalski and allegedly

explained that DOC does not do genetic testing as a rule due to cost, although Furey knew

that the URC approved the testing and that Director Gallagher had withdrawn the request.

*Id.* ¶¶ 72–74.

On January 31, 2019, Director Gallagher (who had then become the new acting

Director of Health Services) allegedly responded to Mr. Michalski's letter to a prior Director

of Health Services complaining about his medical treatment at Osborn; Director Gallagher

allegedly informed him that his treatment was the provider's decision. *Id.* ¶¶ 74–75.

On January 28, 2019, Mr. Michalski allegedly filed an HSR grievance regarding the

withdrawal of the Utilization Review approval. *Id.* ¶ 79. His HSR was allegedly denied for

the stated reason that his "request for testing had been submitted as a mechanism under the

ADA, but the results of such testing would not alter any accommodations as they are based

on function, not diagnosis." *Id.* The denial allegedly further stated that the URC request by

Dr. Wright (per Mr. Michalski's request) allegedly had been withdrawn, as there was no

reason to have the testing and DOC does not provide genetic testing without strong

evidence. *Id.* ¶¶ 78, 82. Mr. Michalski alleges that his record with specialist

recommendations contains strong evidence. *Id.* ¶ 83.

Mr. Michalski's Level 3 appeal allegedly was denied by Director Gallagher on the

grounds that the URC request had been submitted at Mr. Michalski's request to prove his

ADA eligibility, but this proof was not necessary because his symptoms were sufficient. *Id.*

¶¶ 84–85.

On February 7, 2019, Dr. Wright allegedly informed Mr. Michalski that Director Gallagher had withdrawn the Utilzation Review approval for genetic testing because a diagnosis would render Mr. Michalski eligible for ADA benefits, such as a medical mattress. *Id.* ¶ 87. Dr. Wright allegedly stated that DOC does not like to give out medical mattresses. *Id.*

On February 13, 2019, Dr. Wright allegedly informed Mr. Michalski that the best way to prevent future compression was for him to receive a medical mattress and that there were new criteria for such mattresses. *Id.* ¶ 88. Dr. Wright allegedly recommended that Mr. Michalski file an ADA Request for Reasonable Accommodation form under the new eligibility criteria. *Id.*

On February 18, 2019, Mr. Michalski allegedly filed his ADA form for a medical mattress based on his degenerative nerve disease. *Id.* ¶ 89.

On April 20, 2019, Mr. Michalksi allegedly filed an HSR seeking permission to purchase a genetic testing kit at his own expense. *Id.* ¶ 90. On April 25, 2019, Mr. Michalski allegedly filed an HSR about the Utilization Review approval withdrawal for non-medical reasons by non-physicians. *Id.* ¶ 91. After both HSRs were allegedly rejected as duplicates, Mr. Michalski allegedly filed an appeal of his HSR seeking to have genetic testing at his own expense. *Id.* ¶¶ 92–93.

HSA Furey allegedly responded that the testing would not be allowed in prison and he should wait until he got out of prison to have the genetic testing. *Id.* ¶ 93.

On July 12, 2019, Mr. Michalski allegedly met with Dr. Imperiolli at Dr. Wright's request for an EMG, which still showed persistent evidence of severe unlar monneuroptathy at the left elbow and severe bilateral monnueroepathies at the wrists. *Id.* ¶ 96. Dr. Imperiolli

allegedly stated that HNPP remains a diagnostic pssibility. *Id.* ¶ 97. He also allegedly indicated that it would cost approximately $250 if the patient paid out of pocket and to contact him for any questions. *Id.*

On November 14, 2019, Mr. Michalski allegedly appeared in a pre-trial hearing for his state medical habeas. *Id.* ¶ 98. Dr. Freston allegedly stated that Mr. Michalski should receive testing and could not believe it had not been performed. *Id.* ¶ 99.

On December 13, 2019, Mr. Michalski allegedly had his genetic testing; all costs were allegedly waived by Invitae because Mr. Michalski is a prisoner. *Id.* ¶¶ 101–102.

In late January 2020, Dr. Wright allegedly informed Mr. Michalski that HNPP was not the cause of his injuries (as Mr. Michalski allegedly suspected). *Id.* ¶ 103. The genetic testing, however, allegedly revealed that there was a "Variant of Uncertain Significance" in a gene identified as ELP1. *Id.* ¶ 104. The ELP1 gene is allegedly associated with autosomal recessive familial dystautomia ("FD") and hereditary sensory and autonomic neuropathy ("HSAN3"). *Id.* The particular vaiant of the ELP1 gene is allegedly so rare that experiemental studies and prediction algorithms to predict what will happen to Mr. Michalski's nerves and body are not available. *Id.* ¶ 106.

On February 16, 2021, Mr. Michalski allegedly met with two neurologists who discovered that the proper test for deletion of the PMP22 gene was not performed, although this test had been ordered and fifteen other genetic tests had been performed. *Id.* ¶¶ 107–110. Mr. Michalski allegedly is still suspected of having HNPP, in addition to the serious diseases associated with the ELP1. *Id.* ¶ 110.

Mr. Michalski alleges that Dr. Ruiz's failure to order the genetic testing caused him unnecessary nerve damage and muscle atrophy. *Id.* ¶ 112. Without a diagnosis, Mr.

Michalski allegedly could not receive the treatment he needed, and Dr. Ruiz failed to order the testing or the bedding and padding. *Id.* ¶ 113. Mr. Michalski allegedly suffers from many symptoms including chronic pain, nerve degeneration, hand cramping, pins and needle sensations, sciatica, loss of sensory and motor function in his hands, and loss of feeling in his fingers. *Id.* ¶ 122. He also allegedly suffers from blurred vision, vertigo, fatigue, back pain, spasticity, cold sweaty feet, mood swings, eye twitches, cognitive problems, and fatigue, which symptoms are likely related to his nerve disease and other neurological diseases. *Id.* ¶ 123.

## II.    STANDARD OF REVIEW

Under 28 U.S.C. § 1915A(b), district courts must review prisoners' civil complaints against governmental actors and *sua sponte* "dismiss . . . any portion of [a] complaint [that] is frivolous, malicious, or fails to state a claim upon which relief may be granted," or that "seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b); *see also Liner v. Goord*, 196 F.3d 132, 134 & n.1 (2d Cir. 1999) (explaining that, under the Prisoner Litigation Reform Act, *sua sponte* dismissal of frivolous prisoner complaints is mandatory); *Tapia-Ortiz v. Winter*, 185 F.3d 8, 11 (2d Cir. 1999) ("Section 1915A requires that a district court screen a civil complaint brought by a prisoner against a governmental entity or its agents and dismiss the complaint *sua sponte* if, *inter alia,* the complaint is 'frivolous, malicious, or fails to state a claim upon which relief may be granted.'" (quoting 28 U.S.C. § 1915A)).

Rule 8 of the Federal Rules of Civil Procedure requires that a plaintiff plead only "a short and plain statement of the claim showing that the pleader is entitled to relief," *see* Fed. R. Civ. P. 8(a)(2), to provide the defendant "fair notice of what the . . . claim is and the grounds upon

which it rests," *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks and citation omitted).

A plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 555, and assert a cause of action with enough heft to show entitlement to relief and "enough facts to state a claim to relief that is plausible on its face," *id.* at 570. A claim is facially plausible if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Although the Federal Rules of Civil Procedure do not require "detailed factual allegations," a complaint must offer more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement." *Twombly*, 550 U.S. at 555–57. Plausibility at the pleading stage is nonetheless distinct from probability, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the claim] is improbable, and . . . recovery is very remote and unlikely." *Id.* at 556 (internal quotation marks and citation omitted).

Complaints filed by *pro se* plaintiffs, however, "must be construed liberally and interpreted to raise the strongest arguments that they suggest." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F. 3d 471, 474 (2d Cir. 2006)) (internal quotation marks omitted); *see also Tracy v. Freshwater*, 623 F. 3d 90, 101–02 (2d Cir. 2010) (discussing the "special solicitude" courts afford *pro se* litigants).

## III.   DISCUSSION

Mr. Michalski's Amended Complaint asserts that Ms. Gallagher, Mr. Furey and Dr. Ruiz all had knowlege of his degenerative conditions but acted with deliberate indifference to his

worsening condition and pain. *Id.* ¶¶ 115–121. He also alleges that Mr. Long acted with

deliberate indifference by denying his ADA request without sufficient consideration or

consultation with medical professionals. *Id.* ¶ 147. The Court considers whether Mr. Michalski's

Amended Complaint has alleged plausible Eighth Amendment violations against these

inidividuals.

### A. The Eighth Amendment Deliberate Indifference to Medical Needs Claim

In *Estelle v. Gamble*, 429 U.S. 97 (1976), the United States Supreme Court held that

"deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and

wanton infliction of pain proscribed by the Eighth Amendment." *Id.* at 104 (internal quotation

marks and citation omitted). The Court explained that "[t]his is true whether the indifference is

manifested by prison doctors in their response to the prisoner's needs or by prison guards in

intentionally denying or delaying access to medical care or intentionally interfering with the

treatment once prescribed." *Id.* at 104–105.

Deliberate indifference to serious medical needs occurs when an official knows that an

inmate faces a substantial risk of serious harm and disregards that risk by failing to take

reasonable measures to abate it. *Harrison v. Barkley*, 219 F.3d 132, 137 (2d Cir. 1998)

(citing *Farmer v. Brennan*, 511 U.S. 825, 847 (1994)). In order to state a deliberate indifference

claim, the plaintiff must allege both that his medical need was serious and that the defendants

acted with a sufficiently culpable state of mind. *See Smith v. Carpenter*, 316 F.3d 178, 184 (2d

Cir. 2003) (citing *Estelle*, 492 U.S. at 105). Objectively, the alleged deprivation must be

"sufficiently serious." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). The condition must be "one

that may produce death, degeneration, or extreme pain." *Hathaway v. Coughlin*, 99 F.3d 550,

553 (2d Cir. 1996) (internal quotation marks omitted).

Subjectively, a defendant must have been actually aware of a substantial risk that the plaintiff would suffer serious harm as a result of their conduct. *See Salahuddin v. Goord*, 467 F.3d 263, 280–81 (2d Cir. 2006). Thus, a defendant's mere negligence is not cognizable on an Eighth Amendment deliberate indifference claim. *Carpenter*, 316 F.3d at 184 (citing *Estelle*, 492 U.S. at 105–06). Although "mere medical malpractice is not tantamount to deliberate indifference," such medical malpractice may constitute deliberate indifference when it "involves culpable recklessness, i.e., . . . a conscious disregard of a substantial risk of serious harm." *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998) (quoting *Hathaway*, 99 F.3d at 553) (internal quotation marks omitted).

"In cases where a prisoner alleges a delay in medical treatment, courts examine both the seriousness of the prisoner's medical conditions and the harm caused by any unreasonable delay." *Lombardo v. Graham*, 807 F. App'x 120, 123 (2d Cir. 2020) (summary order) (citing *Salahuddin*, 467 F.3d at 280) (other citations omitted). The court's objective "serious medical need inquiry can properly take into account the severity of the temporary deprivation alleged by the prisoner." *Carpenter*, 316 F.3d at 186. The court should consider the "particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition." *Id.* "[I]n most cases, the actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm." *Id.*; *see also Bilal v. White*, 494 F. App'x 143, 145–46 (2d Cir. 2012) ("Even assuming that Bilal's conditions could produce serious complications if neglected over sufficient time, there is no evidence that Bilal's conditions worsened over the hours of delay here[.]" (internal citation omitted)); *see also Ferguson v. Cai*, No. 11-CV-6181, 2012 WL 2865474, at *4 (S.D.N.Y. July 12, 2012) ("Where

temporary delays or interruptions in the provision of medical treatment have been found to satisfy the objective seriousness requirement in [the Second] Circuit, they have involved either a needlessly prolonged period of delay, or a delay which caused extreme pain or exacerbated a serious illness.").

Relevant to the subjective component of the Eighth Amendment analysis, the defendant must have been actually aware of a substantial risk that the inmate would suffer serious harm as a result of his or her actions or inactions. *See Salahuddin*, 467 F.3d at 280; *Amaker v. Coombe*, No. 96 Civ. 1622, 2002 WL 523388, at *8 (S.D.N.Y. Mar. 29, 2002) ("A delay in medical treatment does not by itself violate an inmate's Eighth Amendment rights unless the delay reflects deliberate indifference to a serious risk of health or safety, to a life-threatening or fast-degenerating condition or to some other condition of extreme pain that might be alleviated through reasonably prompt treatment.").

### 1.  Medical Mattress and Padding

To establish an Eighth Amendment claim alleging a deficient mattress, courts have required a prisoner plaintiff to allege either a medical condition requiring a non-standard mattress to protect against further serious damage to the prisoner's health or a medical condition caused by the inadequate mattress. *See Jones v. City of New York*, No. 18-CV-1937 (VSB), 2020 WL 1644009, at *7 (S.D.N.Y. Apr. 2, 2020) ("To succeed on a claim involving an alleged deficient bed, a plaintiff must allege that [he] had a medical condition requiring a non-standard bed to protect against serious damage to his future health or that the medical condition was itself created by an inadequate bed or mattress." (internal quotation marks and citations omitted)).

For purposes of this initial review, Mr. Michalski has sufficiently alleged that his conditions and pain related to his nerve compression present a sufficiently serious medical need.

Mr. Michalski's amended allegations indicate that Defendants Gallagher, Furey and Dr. Ruiz

acted with deliberate indifference by denying him access to a medical mattress and padding

despite their knowledge or consciousness that these accommodations would assist with his

painful conditions and nerve compression. Mr. Michalski also sufficiently has alleged that ADA

Coordinator Long acted with deliberate indifference to his serious medical needs when she

denied his ADA request for a medical mattress without adequate consideration or consultation

with medical professionals. The Court will permit his claim to proceed against the Defendants in

their individual capacities.

   2.  **Testing**

   Mr. Michalski alleges that Dr. Ruiz, Gallagher, and Furey acted with deliberate

indifference by delaying his genetic testing that would have prevented his deterioration and

access to appropriate treatment.

   Mr. Michalski's Amended Complaint sufficiently alleges that Dr. Ruiz, Gallagher and

Furey were all aware of the recommendations from specialists to provide Mr. Michalski with

genetic testing. For initial pleading purposes, Mr. Michalski has adequately alleged that these

defendants acted with a conscious disregard of his serious medical need for genetic testing

and that the delay to his genetic testing caused him continuing pain and worsening of his

degenerative conditions to worsen without treatment. The Court will permit this claim to

proceed against that Dr. Ruiz, Gallagher, and Furey in their individual capacities.

   Mr. Michalski also has sought an injunctive order for Defendants to provide him with

medical care, including genetic testing and appointments with genetic and neurologic

specialists. *See* Mot. for TRO and Prelim. Inj., ECF No. 4 (Sept. 10, 2020).[2] While the Court

---

[2] In his Motion for a Temporary Restraining Order and Preliminary Injunction, Mr. Michalski requested the Court to order Director Gallagher and HSA Furey to arrange for him "to be examined by a qualified genetic specialist and

has denied this motion for temporary restraining order and preliminary injunction without prejudice, the Court requested that the defendants file a status report about the provision of Mr. Michalski's medical care. Order, ECF No. 21 (May 14, 2021). As Mr. Michalski's amended allegations indicate that he is still waiting for genetic testing and treatment for his pain and degenerative conditions, the Court now also will permit Mr. Michalski to assert his Eighth Amendment claims based on his need for genetic testing and further treatment to proceed against Ms. Gallagher and Mr. Furey in their official capacities. *See Ex parte Young*, 209 U.S. 123 (1908); *In re Deposit Ins. Agency*, 482 F.3d 612, 617 (2d Cir. 2007) ("[A] plaintiff may sue a state official acting in his official capacity—notwithstanding the Eleventh Amendment—for 'prospective injunctive relief' from violations of federal law.").

### ORDERS

The Court enters the following orders:

(1) The case shall proceed on Mr. Michalski's Eighth Amendment claims based on deliberate indifference to his need for a medical mattress against Director Colleen Gallagher, HSA Richard Furey, Dr. Ricardo Ruiz, and ADA Coordinator Devonna Long in their individual capacities; on his claim of deliberate indifference to his need for padding against Dr. Ruiz, Director Gallagher, and HSA Furey in their individual capacities; and on his claim of deliberate indifference to his need for genetic testing and further treatment against HSA Furey, Dr. Ruiz, and Director Gallagher in their individual capacities. Mr. Michalski's Eighth Amendment official capacity claim based on deliberate indifference to his need for genetic testing and further treatment may also proceed against HSA Furey and Director Gallagher.

---

neurologist[,] and to obtain from those specialists an evaluation of the condition of plaintiff's disease and prescription for an adequate treatment plan that will diagnose and treat [his] disease." Mot. for TRO and Prelim. Inj. at 1–2, ECF No. 4-2 (Sept. 10, 2020).

(2) **The Clerk of Court shall** verify the current work addresses for Director Gallagher, Dr. Ruiz, HSA Furey, and ADA Coordinator Long with the DOC Office of Legal Affairs, mail a waiver of service of process request packet containing the Amended Complaint to them at their confirmed addresses by **November 5, 2021**, and report on the status of the waiver request on by **November 19, 2021**. If any Defendant fails to return the waiver request, the Clerk of Court shall make arrangements for in-person individual capacity service by the U.S. Marshals Service on that defendant, and that defendant shall be required to pay the costs of such service in accordance with Federal Rule of Civil Procedure 4(d).

(3) T**he Clerk of Court shall** prepare a summons form and send an official capacity service packet to the U.S. Marshal Service. The U.S. Marshal Service is directed to effect service of the Amended Complaint and this Order on Director Gallagher and HSA Furey in their official capacities at the Office of the Attorney General, 165 Capitol Avenue, Hartford, CT 06106, by **November 5, 2021** and to file a return of service by **November 19, 2021**. **Defendants are instructed to file a status report regarding the provision of Mr. Michalski's medical care relevant to this action by November 12, 2021.**

(4) **The Clerk of Court shall** mail a courtesy copy of the Amended Complaint and this Order to the DOC Office of Legal Affairs and Office of the Attorney General.

(5) **The Defendants shall** file their response to the Amended Complaint, either an Answer or motion to dismiss, by **December 17, 2021**. If the Defendants choose to file an Answer, they shall admit or deny the allegations and respond to the cognizable claims recited above. The Defendants may also include any and all additional defenses permitted by the Federal Rules.

17

(6) Discovery, according to Federal Rules of Civil Procedure 26-37, shall be completed by **April 1, 2022**. Discovery requests need not be filed with the Court.

(7) The parties must comply with the District of Connecticut "Standing Order Re: Initial Discovery Disclosures," which will be sent to both parties by the Court. The Order can also be found at http://ctd.uscourts.gov/administrative-standing-orders.

(8) All motions for summary judgment shall be filed by **May 6, 2022**.

(9) According to Local Civil Rule 7(a), a nonmoving party must respond to a dispositive motion within **twenty-one (21) days** of the date the motion was filed. If no response is filed, or the response is not timely, the dispositive motion can be granted absent objection.

(10)  If Mr. Michalski changes his address at any time during the litigation of this case, Local Court Rule 83.1(c)2 provides that he MUST notify the Court. Failure to do so can result in the dismissal of the case. Mr. Michalski must give notice of a new address even if he is incarcerated. He should write "PLEASE NOTE MY NEW ADDRESS" on the notice. It is not enough to just put the new address on a letter without indicating that it is a new address. If Mr. Michalski has more than one pending case, he should indicate all of the case numbers in the notification of change of address. He should also notify the defendants or defense counsel of his new address.

(11) Mr. Michalski shall utilize the Prisoner Efiling Program when filing documents with the court. Mr. Michalski is advised that the Program may be used only to file documents with the court. Local court rules provide that discovery requests are not filed with the court. D. Conn. L. Civ. R. 5(f). Therefore, discovery requests must be served on defendants' counsel by regular mail.

**SO ORDERED** at Bridgeport, Connecticut, this 20th day of October, 2021.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE